**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| CYNTHIA LOVE, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 23-cv-2392 |
| | ) | |
| v. | ) | Hon. Steven C. Seeger |
| | ) | |
| CLARENCE IVY SIMMONS, JR., *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

Today, Kanye West is one of the most famous – some might say infamous – artists in the music industry.  But back in 2003, West was a little-known, up-and-coming rapper.  And he got his big start from a setback.  West shattered his jaw in a car accident.  While recuperating in the hospital, with his jaw wired shut, inspiration struck.

West recorded a mixtape for a track called "Through the Wire."  The song became a break-out hit.  It was West's debut solo single, and it jumpstarted his career.

The "Through the Wire" music video, recorded in 2003, was a hit, too.  It has millions of views on YouTube.  It took home the Video of the Year honor at the 2004 Source Hip Hop Awards.

That video is where Plaintiff Cynthia Love comes into the picture, literally and figuratively.  Love makes a short appearance in the "Through the Wire" music video.  She does a little hoppity spin-dance in a barbecue restaurant, before asking West for some change.  She looks unsteady, and sounds slurred.  It is hard to tell if West looks impressed.

Decades later, clips of Love from that music video, plus previously unreleased footage, appeared in a 2022 docuseries released on Netflix, called "Jeen-yuhs:  A Kanye Trilogy."

"Jeen-yuhs" has three parts, each about 90 minutes long. Footage of Love appears for less than two minutes.

Love takes issue with how she was portrayed in the clips taken in that BBQ restaurant decades ago. So she sued Netflix, along with documentarians Clarence Ivy Simmons, Jr. and Chike Antoine Ozah. She brought a host of tort claims. Defendants, in turn, moved to dismiss.

For the reasons stated below, the motion to dismiss is granted.

## Background

At the motion-to-dismiss stage, the Court must accept as true the well-pleaded allegations of the complaint. *See Lett v. City of Chicago*, 946 F.3d 398, 399 (7th Cir. 2020). The Court "offer[s] no opinion on the ultimate merits because further development of the record may cast the facts in a light different from the complaint." *Savory v. Cannon*, 947 F.3d 409, 412 (7th Cir. 2020).

The case is about a music video by Kanye West. If you're reading this opinion, and you haven't been living under a rock, you know who he is. West is one of the most well-known artists in the music industry. He's inescapable. And he's from Chicago.

West has gotten into some hot water over the years by opening his mouth. But his career began with his mouth shut – wired shut.

West shattered his jaw in an accident, and the hospital wired his jaw shut. The wire, it seems, spoke to him. He wrote a song called "Through the Wire," which became his breakout hit.[1] He got hit by a car, and then by an idea.

---

[1] "Through the Wire" samples Chaka Khan's 1984 hit, "Through the Fire," with Khan's voice pitched up in a squeal reminiscent of Alvin and the Chipmunks. Khan gave West permission to use her song – but she was less than impressed with the finished product, which she thought was "stupid." *See* Eileen Reslen, *Chaka Khan Slams Kanye West for 'Through the Wire' Sample*, Page Six (June 27, 2019), https://pagesix.com/2019/06/27/chaka-khan-slams-kanye-west-for-through-the-wire-sample/. The track peaked at No. 15 on the Billboard Hot 100 chart. *See* Xander Zellner, *Kanye West's Biggest Billboard*

West promoted the song with a music video. The video begins with a nod to his wired jaw: "Last October grammy nominated producer KANYE WEST was in a nearly fatal car accident. His jaw was fractured in three places. Two weeks later he recorded this song with his mouth still wired shut . . . so the world could feel his pain!" Channelzerotv, *Kanye West – Through The Wire*, YouTube (Oct. 3, 2006), https://www.youtube.com/watch?v=uvb-1wjAtk4. (ellipsis in original). Along the way, the video shows clips of the medical staff wiring his mouth shut.

West recorded the video in 2003. *See* Cplt., at ¶¶ 12, 22 (Dckt. No. 1-1). The video garnered a lot of attention. It has tens of millions of views on YouTube.[2]

Plaintiff Cynthia Love appears in the "Through the Wire" music video. The music video opens with Love dancing in the lobby of Original Leon's Bar-B-Q, a Chicago restaurant, for about 12 seconds. "Dancing" might be a strong word. She spins around, and seems to stumble a little. She doesn't look particularly adroit on her feet. And her speech sounds a bit slurred.

Love was paid $20 for her appearance. *Id.* at ¶ 14. Love says that she was in an altered state when filming the video. *Id.* at ¶ 15.

Defendants Clarence Ivy Simmons, Jr. and Chike Antoine Ozah were behind the camera when Love was filmed. Simmons and Ozah, known professionally as "Coodie and Chike," made the "Through the Wire" video. *Id.* at ¶ 6. According to Love, Simmons and Ozah chose to feature her in the video because of her altered state. *Id.* at ¶ 16.

---

*Hot 100 Hits*, Billboard (May 31, 2018), https://www.billboard.com/pro/kanye-west-biggest-billboard-hot-100-hits/. It received a Grammy nomination (but lost to Jay-Z's "99 Problems"). *See Artist: Kanye West*, Grammy.com, https://www.grammy.com/artists/kanye-west/6900 (last visited Feb. 22, 2024).

[2] Channelzerotv, *Kanye West – Through The Wire*, YouTube (Oct. 3, 2006), https://www.youtube.com/watch?v=uvb-1wjAtk4 (showing 32.9 million views as of February 2024); *2004 Source Hip-Hop Music Awards Winners*, Billboard (Oct. 11, 2004), https://www.billboard.com/music/music-news/2004-source-hip-hop-music-awards-winners-66144/. The number keeps climbing. The video has received more than half a million views since the Court started working on this opinion (not that long ago).

More recently, Simmons and Ozah created a docuseries about West, titled "Jeen-yuhs: A Kanye Trilogy." *Id.* at ¶ 7. The docuseries was released on Netflix in February 2022, meaning 19 years after the making of the "Through the Wire" music video. *Id.* at ¶¶ 11, 18.

"Jeen-yuhs" features footage of Love from the "Through the Wire" video. *Id.* at ¶ 19. "Jeen-yuhs" also includes previously unreleased footage of Love at the barbecue restaurant. *Id.* Love appears briefly in episodes 1 and 2 of the trilogy.

Episode 1 shows West and Love in the lobby of the barbecue joint. Love jokes around with West about the making of the video. *See* "Jeen-yuhs" Documentary (Ep. 1), at 1:13:22 – 1:14:03 (Dckt. No. 12-1). She does a more extended, elaborate "old-school" dance, apparently inspired by a Jay-Z music video for Izzo (H.O.V.A.). *Hear generally* Jay-Z, Izzo (H.O.V.A.) (2001).

As she twirls around, Love is laughing all the while. "We working on a new video. . . . It's yours. It's Kanye West's video." *See* "Jeen-yuhs" Documentary (Ep. 1), at 1:13:22 – 1:13:55 (Dckt. No. 12-1).

Love asks West for some change, he obliges, and she says, "God bless you, baby. Thank you for real." *Id.* She gives West a hug. *Id.* The conversation ends after less than a minute. Episode 1 includes no commentary about Love from West or the narrator. *Id.*

Episode 2 includes a clip from the "Through the Wire" music video release party in 2003. *See* "Jeen-yuhs" Documentary (Ep. 2), at 1:04:43 – 1:04:52 (Dckt. No. 12-1). Footage from the video plays on a large screen at the party. The party itself happened two decades ago. *Id.*

According to the complaint, "Jeen-yuhs" captures Love's "darkest moments." *See* Cplt., at ¶ 22 (Dckt. No. 1-1). It pictures her as "intoxicated, drunk and/or stoned, addicted and/or

4

living in an addiction-fueled lifestyle, inebriated, vagrant and/or possibly homeless, broke, impoverished, disheveled, and desperate." *Id.* at ¶ 20.

Since that day in the barbecue restaurant, Love has turned things around. She has stayed sober for almost two decades, renewed relationships with family and friends, and held down long-term jobs. *Id.* at ¶ 22. People learned about her checkered past for the first time after seeing "Jeen-yuhs." *Id.*

Love filed suit against Netflix, Simmons, Ozah in Illinois state court. *Id.* Defendants removed the case to federal court. *See* Notice of Removal, at 1 (Dckt. No. 1).

Love brings 22 claims. For the most part, she filed the same claims against each Defendant. Basically, there are seven different claims against each defendant (7 x 3 = 21), plus a conspiracy claim against all three, for a total of 22 claims.

Counts I, II, and III allege defamation *per se*. *See* Cplt., at 4–8 (Dckt. No. 1-1). So, Count I is a defamation *per se* claim against Simmons, and Count II is a defamation *per se* claim against Ozah, and so on.

Counts IV, V, and VI allege defamation *per quod*. *Id.* at 8–10.

Counts VII, VIII, and IX are false light claims. *Id.* at 10–14.

Counts X, XI, and XII allege unlawful publicity in violation of the Illinois Right of Publicity Act, 765 ILCS 1075.[3] *Id.* at 14–17.

Counts XIII, XIV, and XV allege intentional infliction of emotional distress. *Id.* at 17–20.

---

[3] In the complaint, Love identifies the statutory basis for her unlawful publicity claims as 735 [sic] ILCS 1075 *et al.* *See* Cplt., at 16–19 (Dckt. No. 1-1). The Illinois Right of Publicity Act is codified at 765 ILCS 1075, not 735 ILCS 1075. *See* 765 ILCS 1075. But the parties get the citation right in their briefs. *See* Defs.' Mem. in Support of Mtn. to Dismiss, at 12 (Dckt. No. 12); Pl.'s Resp. to Defs.' Mtn. to Dismiss, at 6 (Dckt. No. 19). The Court simply flags this discrepancy to nip any confusion in the bud.

Count XVI alleges that Netflix, Simmons, and Ozah were in a civil conspiracy. *Id.* at 20.

Counts XVII, XVIII, and XIX are for *quantum meruit*. *Id.* at 20–23.

Finally, Counts XX, XXI, XXII are for unjust enrichment. *Id.* at 23–25.

Defendants moved to dismiss each of the counts for failure to state a claim. *See* Mtn. to Dismiss, at 1 (Dckt. No. 11).

### Legal Standard

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not the merits of the case. *See* Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). In considering a motion to dismiss, the Court must accept as true all well-pleaded facts in the complaint and draw all reasonable inferences in the plaintiff's favor. *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 614 (7th Cir. 2011). To survive, the complaint must give the defendant fair notice of the basis for the claim, and it must be facially plausible. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

When reviewing a motion to dismiss under Rule 12(b)(6), the court may consider "the complaint itself, documents attached to the complaint, documents that are critical to the complaint and referred to in it, and information that is subject to proper judicial notice." *Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012). "When an exhibit incontrovertibly contradicts the allegations in the complaint, the exhibit ordinarily controls, even when considering a motion to dismiss." *Bogie v. Rosenberg*, 705 F.3d 603, 609 (7th Cir. 2013).

And that principle extends to video recordings attached to or referenced in a complaint. *Id.*; *see also Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687, 691 (7th Cir. 2012).

### Analysis

Before diving in, the Court offers an overarching observation. Love's claims center around her appearance in "Jeen-yuhs." The "Jeen-yuhs" series features three episodes, and each episode is about an hour and a half long. Love appears in less than two minutes of footage, across two episodes.

So, this case is about the use of a couple minutes of 20-year-old video clips in a docuseries with a runtime of around 4.5 hours. The brevity of the clips does not determine whether Love has a claim, but it does help to put things in perspective.

With that observation in mind, the Court will address each of the claims, in the order that they appear in the complaint.

The Court will start with Love's defamation claims, followed by the false light claims. Then, the Court will address the right of publicity claims and the intentional infliction of emotional distress claims. After that, the Court will address the civil conspiracy claims. The Court will end by discussing *quantum meruit* and unjust enrichment.

### I.    Defamation Claims (Counts I–VI)

The first six claims allege defamation. Counts I, II, and III allege defamation *per se*. *See* Cplt., at 4–8 (Dckt. No. 1-1). Counts IV, V, and VI allege defamation *per quod*. *Id.* at 8–10.

"To state a defamation claim, a plaintiff must present facts showing that the defendant made a false statement about the plaintiff, that the defendant made an unprivileged publication of that statement to a third party, and that this publication caused damages." *Green v. Rogers*, 917 N.E.2d 450, 459 (Ill. 2009). "A defamatory statement is a statement that harms a person's

reputation to the extent it lowers the person in the eyes of the community or deters the community from associating with her or him." *Id.*

The difference between defamation *per se* and defamation *per quod* is whether the listener would need an explanation to understand the harm inflicted by the statement. "Statements are considered defamatory *per se* when the defamatory character of the statement is apparent on its face; that is, when the words used are so obviously and materially harmful to the plaintiff that injury to his reputation may be presumed. Statements are considered defamatory *per quod* if the defamatory character of the statement is not apparent on its face, and extrinsic facts are required to explain its defamatory meaning." *Kapotas v. Better Gov't Ass'n*, 30 N.E.3d 572, 587 (Ill. App. Ct. 2015) (cleaned up).

The names are different, but the elements are not. Under Illinois law, the elements of a defamation claim are the same whether the plaintiff alleges defamation *per se* or *per quod*. *See Doctor's Data, Inc. v. Barrett*, 170 F. Supp. 3d 1087, 1102 (N.D. Ill. 2016). The difference lies in the requirements for pleading and proving damages. *See Tuite v. Corbitt*, 866 N.E.2d 114, 121 (Ill. 2006).

Defamation requires falsity. "Truth is an absolute defense to defamation; true statements cannot support a claim of defamation." *Hnilica v. Rizza Chevrolet, Inc.*, 893 N.E.2d 928, 931 (Ill. App. Ct. 2008).

A truthful statement that harms a person's reputation isn't defamation. It's the sting of the truth. Sometimes the truth hurts, and when the truth hurts, it isn't defamation.

Under Illinois law, "a statement need not be accurate in every detail as long as the 'gist' or 'sting' of the statement is true." *Black v. Wrigley*, 2019 WL 2433740, at *4 (N.D. Ill. 2019).

"[T]he burden of proving falsity rests on the plaintiff." *Haynes v. Alfred A. Knopf, Inc.*, 8 F.3d 1222, 1228 (7th Cir. 1993).

The Court does not need to separately consider Love's defamation *per se* and *per quod* claims because she stumbles over the same hurdle for both. Plain and simple, any allegations about Love in the "Jeen-yuhs" docuseries are true. The docuseries includes real-world clips of Love, without doctoring the content or adding any false material. It shows true clips of a real event.

Love believes that her defamation claims can move forward because she is not the same person now that she was in 2003, when they made the music video. As she sees it, "Jeen-yuhs" captures a moment in time and depicts her at her "darkest moments." *See* Cplt., at ¶ 22 (Dckt. No. 1-1). She concedes that she was "obviously intoxicated" at the time of filming. *See* Pl's. Resp. to Defs.' Mtn. to Dismiss, at 4 (Dckt. No. 19).

Love emphasizes how she changed between the time of the music video (2003) and the time of the "Jeen-yuhs" docuseries on Netflix (2022). When "Jeen-yuhs" was "produced and published, she had been sober for many years." *Id.* In other words, the footage was true *then*, but it isn't true *now*.

According to Defendants, "Jeen-yuhs" makes clear that the footage is from twenty years ago. *See* Defs.' Reply, at 2 (Dckt. No. 20). And the fact that Love later turned things around does not make footage from *years earlier* false. *Id.*

Defendants hit the nail on the head. A claim for defamation fails when "the alleged falsehoods were merely illustrations of undoubted truths about [the plaintiff's] character *at the time*." *Haynes v. Alfred A. Knopf, Inc.*, 8 F.3d 1222, 1229 (7th Cir. 1993) (emphasis added).

So, a defamation claim fails if the allegedly defamatory statement is a *historical* truth, even if it is not a *current* truth. *See, e.g.*, *Hardiman v. Aslam*, 125 N.E.3d 1185, 1193–94 (Ill. App. Ct. 2019) (concluding that statements that plaintiff was convicted of domestic violence were "substantially true" where defendant pleaded guilty to simple battery of his wife and his guilty plea was expunged); *Haynes*, 8 F.3d at 1229–31 (affirming summary judgment against plaintiff on a libel claim where plaintiff was depicted in a book as a heavy drinker, but had since "turned his life around").

Holding up a mirror isn't defamation. Holding up a 20-year-old picture isn't defamation, either. They both reflect reality, like it or not. But defamation requires falsity.

The "Jeen-yuhs" video accurately portrays Love in a moment of time several decades ago. The video does not suggest that Love remains in an intoxicated state, or anything of that sort. The video shows a past truth, without suggesting that the past is the present. The footage is historically accurate, so Love's defamation claims cannot get off the ground.

Pivoting, Love points out that a clip of her appears in the second episode of the tripartite "Jeen-yuhs" series. *See* Pl's. Resp. to Defs.' Mtn. to Dismiss, at 5 (Dckt. No. 19). According to Love, because episode 2 shows West's career taking off, the episode leaves viewers with a false impression that Love's life circumstances are unchanged. *Id.*

Not so. The documentarians captured footage of Love on only one day in 2003. *See* Cplt., at ¶ 22 (Dckt. No. 1-1). The documentary makes no statement about her current state. It does not suggest that Love continued to remain in that condition over the years.

Netflix viewers can see the obvious overlap between the clips of Love in episode one and episode two. Love is shown wearing the same clothes, sporting the same hairstyle, and standing in the same place. Netflix viewers can put two and two together and understand that they're

watching footage from 2003, once again.  No viewer would believe that episode 2 depicts recent footage of Love.

In sum, a viewer of "Jeen-yuhs" would not "perceive Ms. Love's life and lifestyle today as abhorrent and loathsome" based on less than two minutes of 20-year-old footage.  *See* Cplt., at 6 (Dckt. No. 1-1).  "Jeen-yuhs" accurately portrays Love at the time of filming, and does not make any representations about who she is today.

Love has failed to allege that "Jeen-yuhs" makes a false statement about her.  So she has no defamation claim.  Counts I through VI are dismissed.

## II. False Light Claims (Counts VII–IX)

Counts VII through IX are false light claims.  *Id.* at 10–14.

"To sustain this cause of action, a plaintiff must plead:  (1) [s]he was placed in a false light before the public by the defendant; (2) the false light would be offensive to a reasonable person; and (3) the defendant acted with actual malice."  *Seith v. Chicago Sun-Times, Inc.*, 861 N.E.2d 1117, 1130 (Ill. App. Ct. 2007).  A plaintiff must show that the defendant made a *false* statement about her to prevail on a false light claim.  *See Fei Wang v. Bd. of Trustees of Univ. of Illinois*, 612 F. Supp. 3d 739, 752 (N.D. Ill. 2020).

If a "plaintiff's unsuccessful defamation *per se* claim is the basis of [her] false-light claim, plaintiff's false-light invasion of privacy claim fails as well."  *Id.*; *see also Pope v. Chron. Pub. Co.*, 95 F.3d 607, 616 (7th Cir. 1996) (explaining that plaintiff's false light claim failed for "many of the same reasons his defamation suit suffers that fate" – including because the publication was "substantially true").

Love's defamation and false light claims rest on the same set of facts.  *Compare* Cplt., at 9 (Dckt. No. 1-1) (defamation *per se* claim) ("The depiction of Plaintiff Ms. Love presented in

the NETFLIX series *jeen-yuhs: A Kanye Trilogy* as broadcast in episodes 1 and 2, presents Ms. Love in a manner whereby a viewer would perceive her as vulgar, untrustworthy, of ill repute, unemployable, potentially violent, addicted, and living an immoral lifestyle."), *with id.* at 13 (false light claim) ("The Defendant's depiction of Ms. Love in *jeen-yuhs: A Kanye Trilogy* is false in that viewers would believe Ms. Love to be vulgar, untrustworthy, of ill repute, unemployable, potentially violent, addicted, and living an immoral lifestyle, being afflicted with loathsome communicable diseases, an adulterer, a fornicator, and/or living an immoral lifestyle or living such a dark and heartbreaking lifestyle that she would be dead by now.").

Love runs into trouble with the first element of a false light claim. She concedes that the depiction of her in "Jeen-yuhs" was true at the time of filming. *See* Pl.'s Resp. to Defs.' Mtn. to Dismiss, at 4 (Dckt. No. 19).

So, Love was not placed in a *false* light. *See Seith*, 861 N.E.2d at 1130. She was placed in a true light. The fact that the light might have been unflattering doesn't mean that it was false. It's a *false* light claim, not an *unflattering* light claim.

Love makes a similar argument about her false light claim that she made for defamation – namely, that she "worked hard to transform her life and has put her tumultuous past behind her . . . ." *See* Pl.'s Resp. to Defs.' Mtn. to Dismiss, at 6 (Dckt. No. 19).

Again, Love may prefer to leave her past in the rear view mirror (and off Netflix). But "Jeen-yuhs" does not contain false statements about her. Without falsity, it's light's out for the false light claim.

Counts VII through IX are dismissed.

**III.     Right of Publicity Claims (Counts X–XII)**

Counts X, XI, and XII allege unlawful publicity in violation of the Illinois Right of Publicity Act, 765 ILCS 1075 *et seq.  See* Cplt., at 14–17 (Dckt. No. 1-1).

Illinois law recognizes a statutory right of publicity.  "The right to control and to choose whether and how to use an individual's identity for commercial purposes is recognized as each individual's right of publicity."  *See* 765 ILCS 1075/10.  The Act defines a "commercial purpose" as "the public use or holding out of an individual's identity (i) on or in connection with the offering for sale or sale of a product, merchandise, goods, or services; (ii) for purposes of advertising or promoting products, merchandise, goods, or services; or (iii) for the purpose of fundraising."  *See* 765 ILCS 1075/5.

The Act "prohibits use of an individual's identity for commercial purposes without written consent."  *Best v. Malec*, 2010 WL 2364412, at *3 (N.D. Ill. 2010).  "A person may not use an individual's identity for commercial purposes during the individual's lifetime without having obtained previous written consent from the appropriate person or persons specified in Section 20 of this Act or their authorized representative."  *See* 765 ILCS 1075/30(a).

Defendants do not contest that "Jeen-yuhs" used Love's identity without written consent.  But the statute includes a number of carve-outs, and Defendants argue that two of those exemptions apply here.  *See* Defs.' Mem. in Support of Mtn. to Dismiss, at 12 (Dckt. No. 12).  Specifically, Defendants contend that the statute does not apply in light of (1) the exemption for "audio-visual works," and (2) the exemption for "public affairs."  *Id.*  The first exemption applies to artistic works, while the second applies to news and other matters of public interest.

The Court will address each exemption in turn.

13

A.      **"Audio-Visual Work" Exemption**

"The Illinois Right of Publicity Act clearly and unambiguously exempts artistic works, including television productions . . . from its coverage, thus avoiding [] serious First Amendment problems." *Collier v. Murphy*, 2003 WL 1606637, at *3 (N.D. Ill. 2003); *see also Zglobicki v. Travel Channel, LLC*, 2012 WL 725570, at *2 (N.D. Ill. 2012).

Specifically, the Act does not apply to "use of an individual's identity in an attempt to portray, describe, or impersonate that individual in a live performance, a single and original work of fine art, play, book, article, musical work, film, radio, television, or other audio, visual, or audio-visual work, provided that the performance, work, play, book, article, or film does not constitute in and of itself a commercial advertisement for a product, merchandise, goods, or services." *See* 765 ILCS 1075/35(b)(1). That's the so-called "audio-visual work" exemption.

The statutory text is broad, and "Jeen-yuhs" seems to fall within it. "Jeen-yuhs" is a "film" or an "audio-visual work." *Id.* The docuseries used Love's "identity" to "portray" her, too.

Love argues that the "audio-visual work" exemption does not apply because Defendants were paid for their work. *See* Pl.'s Resp. to Defs.' Mtn. to Dismiss, at 7 (Dckt. No. 19) ("The Trilogy was created as a product to be advertised on the Netflix platform for profit. It has been reported in the press that Defendant Netflix paid Defendants Simmons and Ozah $30,000,000.").

That argument doesn't get Love very far. Artists frequently receive payment for their work. Works of art – from fine art to films to music – often generate significant revenue for the players involved. Kanye West himself has earned untold millions of dollars from artistic work in

music and beyond.[4]  Artists oftentimes make no money.  But sometimes they do.  And the absence or presence of money does not dictate whether it qualifies as art.

Shifting gears, Love contends that the "audio-visual work" exemption doesn't apply because Defendants did not attempt to "portray, describe, or impersonate" her.  Instead, "Jeen-yuhs" featured true footage of Love.  *See* Pl.'s Resp. to Defs.' Mtn. to Dismiss, at 8 (Dckt. No. 19) (quoting 765 ILCS 1075/35(b)(1)).  The argument seems to be that it is not a *portrayal* if it is true, like a mirror image of someone.

That argument runs into trouble after a quick look at Merriam-Webster.  The word "portray" means "to make a picture of:  depict."  *Portray*, Merriam-Webster's Dictionary, https://www.merriam-webster.com/dictionary/portray (last visited Feb. 22, 2024).  In a literal sense, a film (such as a documentary) consists of a series of pictures.  A movie, after all, is a motion *picture*.  So, plain and simple, "Jeen-yuhs" appears to "depict" – meaning, "portray" – Love.

Love points to one case to support of her argument that she wasn't "portrayed, described or impersonated."  *See Christianson v. Henry Holt & Co., LLC*, 2007 WL 2680822 (C.D. Ill. 2007).  In *Christianson*, a book publisher used the plaintiff's photograph on a book cover, even though the plaintiff was mentioned nowhere in the book.  *Id.* at *6.  The court concluded that the "audio-visual work" exemption did not apply.  *Id.*

Defendants believe that *Christianson* is distinguishable on the facts.  Defendants point out that the plaintiff in *Christianson* was featured on a book cover – but not so much as

---

[4]  West's music catalog alone reportedly is worth over $100 million.  *See* Lisette Voytko, *Here's Why Kanye West Dropped Off The Forbes Billionaires List*, Forbes (Apr. 5, 2023), https://www.forbes.com/sites/lisettevoytko/2023/04/05/heres-why-kanye-west-dropped-off-the-forbes-billionaires-list/?sh=7bf390291866.

mentioned on the pages within – whereas Love herself is portrayed in "Jeen-yuhs." *See* Defs.'
Reply, at 8 (Dckt. No. 20) (citing *Christianson*, 2007 WL 2680822, at *3).

The Court agrees with Defendants. Love herself appears in the documentary. *See* Cplt.,
at ¶ 19 (Dckt. No. 1-1). The *Christianson* court explained that the exemption might have applied
if the plaintiff were even briefly *mentioned* in the book. *See Christianson*, 2007 WL 2680822, at
*3. So, *Christianson* doesn't move the ball in Love's direction.

One final point. Courts have yet to squarely address whether documentaries fall under
the Illinois Right of Publicity Act's "audio-visual work" exemption. It is hard to see why the
exemption would apply to some types of films, but not others. Documentaries have artistry, too
(ask Ken Burns). The Mona Lisa has artistic value, and it shouldn't matter whether a real
woman sat down for the painting. Truth can be stranger than fiction, and depicting the truth can
require just as much artistry as depicting a fiction.

Courts broadly construe statutory exemptions to prevent First Amendment problems.
*See, e.g.*, *Zglobicki*, 2012 WL 725570, at *2 ("Courts construe the IRPA's non-commercial use
exemption to avoid First Amendment infirmity."); *Collier*, 2003 WL 1606637, at *3; *Best v.
Berard*, 776 F. Supp. 2d 752, 758–59 (N.D. Ill. 2011).

Courts in other jurisdictions have sounded the alarm and expressed serious First
Amendment concerns in right of publicity cases involving documentaries and biopics. *See, e.g.*,
*Hollywood Unlocked, Inc. v. Lifetime Entm't Servs., LLC*, 2021 WL 3265037, at *3 (C.D. Cal.
2021) ("Given the expressive nature and the subject matter of Defendants' documentary,
Plaintiffs' right-of-publicity claims [under California law] must be stricken."); *Brown v.
Showtime Networks, Inc.*, 394 F. Supp. 3d 418, 438 (S.D.N.Y. 2019) (opining that documentary
about Whitney Houston's life fell under expressive work exemption and exemption for matters

16

of public interest); *Seale v. Gramercy Pictures*, 949 F. Supp. 331, 337 (E.D. Pa. 1996) (granting summary judgment on right to publicity claim under Pennsylvania common law "insofar as that claim relates to Defendants' use of Plaintiff's name and likeness in [a] film").

Here, there is no need to wade into constitutional waters, because the "audio-visual work" exemption is broad enough to cover the documentary. The Illinois Right of Publicity Act "audio-visual work" exemption applies to the "Jeen-yuhs" docuseries, which means that Love has no claim.

### B. "Public Affairs" Exemption

Defendants also argue that the "public affairs" exemption applies. The Illinois Right of Publicity Act exempts "use of an individual's identity for non-commercial purposes, including any news, public affairs, or sports broadcast or account, or any political campaign." *See* 765 ILCS 1075/35(b)(2).

Taking a step back, the "public affairs" exemption is a bit of a mystery. The exemption applies to the use of a person's identity "for non-commercial purposes." *Id.* That carve-out seems unnecessary in light of other provisions of the statute.

The Act protects "each individual's right of publicity," and that right means the "right to control and to choose whether and how to use an individual's identity for *commercial* purposes." *See* 765 ILCS 1075/10 (emphasis added). So the right itself contemplates a commercial purpose.

In a similar vein, another section of the statute imposes "[l]imitations regarding use of an individual's identity." *See* 765 ILCS 1075/30. Once again, the statute applies only when the use involves a commercial purpose. "A person may not use an individual's identity *for commercial purposes* during the individual's lifetime without having obtained previous written consent from

17

the appropriate person or persons specified in Section 20 of this Act or their authorized representative." *See* 765 ILCS 1075/30(a) (emphasis added).

Time and again, the statute expressly prohibits the use of another person's identity for a "commercial purpose." So it is hard to see what weight the "public affairs" exemption carries. That exemption says that the Act "does not apply to . . . use of an individual's identity for non-commercial purposes, including any news, public affairs, or sports broadcast or account, or any political campaign." *See* 765 ILCS 1075/35(b)(2).

So, the ban on using someone's identity for commercial purposes does not apply when the use involves non-commercial purposes. The exclusion for non-commercial purposes seems baked into the right already, because the right only applies to the use for commercial purposes. There is no need to exempt use for non-commercial purposes when the right only covers commercial purposes anyway.

Be that as it may, the Court takes the "public affairs" exemption as it finds it.[5] Some things are so important that they are worth saying more than once. And here, the idea behind the "public affairs" exemption is to carve-out speech that is protected by the First Amendment. The punchline is that the statute includes an exemption for non-commercial speech on matters of public interest.[6]

---

[5] Putting aside the redundancy, the "public affairs" exemption contains another curiosity. The list of "non-commercial purposes" includes "any news, public affairs, or sports broadcast or account, or any political campaign." *See* 765 ILCS 1075/35(b)(2). The notion that the news media lacks a commercial purpose is adorable. By and large, it's a for-profit business (even if there aren't a lot of profits these days). If your average person on the street rattled off the names of news companies, not-for-profit companies probably wouldn't dominate the list. The exclusion for a "sports broadcast" is surprising, too. After all, sporting events are some of the biggest commercial events in the country.

[6] Presumably this exemption exists simply to make it doubly-clear that the statute does not apply to non-commercial speech that receives full protection under the First Amendment. Commercial speech and non-commercial speech receive different levels of protection under the First Amendment. *See Snyder v. Phelps*, 562 U.S. 443, 452 (2011) ("[N]ot all speech is of equal First Amendment importance . . . and where matters of purely private significance are at issue, First Amendment protections are often less rigorous."); *Jordan v. Jewel Food Stores, Inc.*, 743 F.3d 509, 515 (7th Cir. 2014) ("Current doctrine holds

18

Defendants argue that the exemption applies because "Jeen-yuhs" shows Love interacting with Kanye West, a "future superstar" who attracts a lot of attention. *See* Defs.' Mem. in Support of Mtn. to Dismiss, at 13 (Dckt. No. 12). As they see it, the use of Love's likeness "falls squarely within the public affairs exemption in 35(b)(2) because the Footage in the Documentary depicts her meeting and interacting with Kanye 'Ye' West, who undoubtedly is 'a subject of general interest and of value and concern to the public.'" *Id.*

The "Jeen-yuhs" docuseries might satisfy the latter part of the exemption, meaning "any news, public affairs, or sports broadcast or account, or any political campaign." *See* 765 ILCS 1075/35(b)(2). The "public affairs" exemption "reasonably may be interpreted to cover the use of [a plaintiff's] identity in an entertainment program that conveys truthful footage . . . and thus implicates a matter of public concern." *Best*, 776 F. Supp. 2d at 759. "Speech deals with matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." *Zglobicki*, 2012 WL 725570, at *2 (quoting *Snyder v. Phelps*, 562 U.S. 443, 453 (2011)).

"News" is a broad term. It doesn't have to mean Walter-Cronkite-level journalism. News can cover things of interest to the community. Including *entertainment* news. The backstory of an entertainer can draw public interest. After all, the very existence of the "Jeen-yuhs" docuseries proves the point. People want to know where the genius came from.

Still, that's only part of the equation. The "public affairs" exemption applies only to the "use of an individual's identity for *non-commercial purposes*." *See* 765 ILCS 1075/35(b)(2) (emphasis added).

---

that commercial speech is constitutionally protected but governmental burdens on this category of speech are scrutinized more leniently than burdens on fully protected noncommercial speech.").

It is hard to see how a film that landed on Netflix has a non-commercial purpose. After all, the complaint alleges that Netflix paid $30 million for it. And Netflix is a for-profit enterprise. If you think that Netflix has a non-commercial purpose, take another look at your credit card bill.

One might wonder whether the phrase "commercial purpose" means advertisements, like commercials on TV. The Act does cover commercials, but it isn't limited to commercials, either. Again, the Act defines a "commercial purpose" as "the public use or holding out of an individual's identity (i) on or in connection with the offering for sale or sale of a product, merchandise, goods, or services; (ii) for purposes of advertising or promoting products, merchandise, goods, or services; or (iii) for the purpose of fundraising." *See* 765 ILCS 1075/5.

Advertisements fall within the definition (meaning the second prong), but so does using a person's identity "in connection with" the sale of a product. *Id.* So the definition is not limited to commercials.

It is hard to avoid the conclusion that using Love for a docuseries on Netflix had a commercial purpose. Defendants used her identity "in connection with the offering for sale or sale of a product," namely, the broadcast of a film on a subscription-based streaming service. *Id.* Netflix sells a product, and the product is access to entertainment content.

Judge Kennelly reached a similar conclusion in *Best v. Malec*, 2010 WL 2364412 (N.D. Ill. 2010). That case involved footage from an arrest that was later aired on television in an episode of *Female Forces*. The arrestee responded by bringing a claim under the Illinois Right of Publicity Act.

Judge Kennelly held that the broadcast involved a "commercial purpose" within the meaning of the statute. "Best alleges that the defendants used her identity in connection with a

product, namely a television show. The *Female Forces* show is a for-profit product, broadcast on a network with commercial advertisements. People pay for television service, including via subscriptions to cable networks such as the Biography Channel. It appears that broadcasting the footage concerning Best on *Female Forces* satisfies the 'commercial purpose' requirement under IRPA."[7] *Id.* at *3; *see also Best*, 776 F. Supp. 2d at 759 ("In its previous decision in this case, the Court rejected defendants' argument that the broadcasting of Best's arrest on *Female Forces* did not satisfy the statutory 'commercial purpose' requirement."); *but see Collier v. Murphy*, 2003 WL 1606637, at *2 (N.D. Ill. 2003) (concluding that a children's television program was not made for a commercial purpose) ("[P]laintiff argues that the series The PJs is itself a commercial product covered by the Act. This is nonsense, because all, or practically all, plays, books, musical works, films, radio productions, or television productions are commercial.").

The same conclusion applies here. Love alleges that Defendants used her likeness for a commercial purpose. So the "public affairs" exemption does not apply.[8]

---

[7] In a later opinion, the court came an inch away from saying that the defendants had a First Amendment right to broadcast the arrest. Instead, the court protected the broadcast by broadly interpreting the "public affairs" exemption. *See Best v. Berard*, 776 F. Supp. 2d 752, 758–59 (N.D. Ill. 2011). The interpretation was so broad that it seemed to ditch the phrase "non-commercial purposes" from the statutory text. "The Court therefore considers whether it may interpret IRPA's 'non-commercial purpose' exemption consistent with its meaning but with any eye toward avoiding a First Amendment violation. As discussed earlier, IRPA exempts from liability the 'use of an individual's identity for non-commercial purposes, including any news, public affairs, or sports broadcast or account, or any political campaign.' This exemption – particularly in reference to 'public affairs' – reasonably may be interpreted to cover the use of Best's identity in an entertainment program that conveys truthful footage of an arrest and thus implicates a matter of public concern. The Court accordingly grants defendants' motion to dismiss count 2 and concludes that defendants' broadcast of the *Female Forces* episode is exempt from IRPA's coverage." *Id.* at 759. So the court avoided the constitutional issue by holding that the "public affairs" exemption applies. But the "public affairs" exemption *can't* apply unless the use involved a "non-commercial" purpose. *See* 765 ILCS 1075/35(b)(2). And the court had already held that the broadcast *did* involve a commercial purpose. So, in effect, the court avoided the constitutional issue by setting aside the phrase "non-commercial purpose" in the exemption.
[8] This Court is not reaching whether the First Amendment protects the "Jeen-yuhs" docuseries and thus prevents a claim under the Act.

*        *        *

In sum, "Jeen-yuhs" falls under the "audio-visual work" exemption, but does not fall within the "public affairs" exemption, to the Illinois Right of Publicity Act. But falling within one exemption is enough to sink the claims. So the Court dismisses Counts X, XI, and XII.

### IV.   Intentional Infliction of Emotional Distress (Counts XIII–XV)

Counts XIII through XV are claims for intentional infliction of emotional distress. *See* Cplt., at 17–20 (Dckt. No. 1-1).

To prove an intentional infliction of emotional distress claim under Illinois law, a plaintiff must show that: "(1) the defendants' conduct was extreme and outrageous; (2) the defendants knew that there was a high probability that their conduct would cause severe emotional distress; and (3) the conduct in fact caused severe emotional distress." *Swearnigen-El v. Cook Cnty. Sheriff's Dep't*, 602 F.3d 852, 864 (7th Cir. 2010) (citing *Kolegas v. Heftel Broad. Corp.*, 607 N.E.2d 201, 211 (Ill. 1992)).

"[M]ere insults, indignities, threats, annoyances, petty oppressions, or other trivialities" do not constitute *severe* emotional distress. *See McGrath v. Fahey*, 533 N.E.2d 806, 809 (Ill. 1988) (citing Restatement (Second) of Torts § 46). "This standard is quite high. In order to meet the threshold for intentional infliction of emotional distress, the defendant's conduct must extend beyond the bounds of human decency and be considered intolerable in a civilized community." *Lewis v. Sch. Dist. #70*, 523 F.3d 730, 747 (7th Cir. 2008); *see also Benton v. Little League Baseball, Inc.*, 181 N.E.3d 902, 926 (Ill. App. Ct. 2020).

"There is no bright-line rule about what satisfies the extreme and outrageous conduct; it is judged by an objective standard, based on all the facts and circumstances of an individual case." *Benton*, 181 N.E.3d at 927.

22

Defamatory statements rarely rise to the level of "extreme and outrageous." *See Fields v. Jackson*, 2017 WL 4150682, at *5 (N.D. Ill. 2017) (Lee, J.) ("As the Seventh Circuit has recognized, Illinois courts have held that a plaintiff cannot prove a claim for intentional infliction of emotional distress based upon a defendant's defamatory statements, because such statements generally do not clear the high hurdle for extreme and outrageous conduct."); *see also Cook v. Winfrey*, 141 F.3d 322, 331 (7th Cir. 1998) (collecting cases).

The truthful nature of the clips might spell trouble and create headwinds for Love's intentional infliction of emotional distress claims. Intentional infliction of emotional distress claims are a tougher row to hoe than defamation claims. *See Cook*, 141 F.3d at 331. Defamatory statements usually don't give rise to a claim for intentional infliction of emotional distress. But here, Love is alleging that Defendants engaged in extreme conduct by publishing images and statements that weren't defamatory at all.

Even so, the fact that the clips show the truth does not foreclose a claim for intentional infliction of emotional distress. Unlike a defamation claim, a claim of intentional infliction of emotional distress does not include falsity as an element. The claim covers "extreme or outrageous conduct," which isn't the same thing as falsity. *See Swearnigen-El*, 602 F.3d 864.

One can imagine situations where depicting the truth might give rise to a claim of intentional infliction of emotional distress. Imagine broadcasting images of a person changing clothes in a dressing room, or getting examined in a doctor's office, or suffering acts of violence, or losing a child, or gasping their last breaths, or something along those lines. Publicizing deeply personal moments of intimacy or trauma is outside the norm, even in this day and age. If anything, sometimes depicting the truth can be more harmful and more extreme than giving a falsehood, because it deprives the victim of the satisfaction of a denial.

23

To bring a claim, Love would have to allege that Defendants engaged in extreme and outrageous conduct when they showed accurate clips of her dance-spinning. Love would have to allege that showing the truth is extreme and outrageous.

After taking a look, the Court concludes that the video clips in question could not give rise to a claim of intentional infliction of emotional distress. The clips show Love doing a little spin, apparently in an inebriated state, inside a barbecue restaurant. That's not the type of image that is "beyond the bounds of human decency and be considered intolerable in a civilized community." *Lewis*, 523 F.3d at 747.

A lighthearted dance by some BBQ is not extreme or outrageous. If anything, dancing while a little intoxicated near some BBQ is an all-American activity. It sounds like the Fourth of July. Lots of viewers might think: been there, done that.

Love argues that Defendants' depiction of her was extreme and outrageous because it caused her to be depicted in a "grotesque, heartbreaking, vulgar, dark, untrustworthy, salacious manner." *See* Pl.'s Resp. to Defs.' Mtn. to Dismiss, at 9 (Dckt. No. 19); *see also* Cplt., at 19 (Dckt. No. 1-1).

But there is nothing particularly shocking, vulgar, or salacious about doing a little dance by some barbecue, even if the dancer had thrown a few back. At the end of the day, "Jeen-yuhs" had a couple minutes of two-decade-old footage of Love. The clips show Love dancing while intoxicated and asking West for spare change. *See* "Jeen-yuhs" Documentary (Ep. 1), at 1:13:22 – 1:14:03 (Dckt. No. 12-1).

Love might not relish how she was portrayed at that moment in her life, especially in light of all of the forward progress that she has made since then. She might find it upsetting or

distressing.  But the depiction of Love does not come close to "extend[ing] beyond the bounds of human decency."  *Lewis*, 523 F.3d at 747.

In sum, Love has not properly pled a claim of intentional infliction of emotional distress. Therefore, the Court dismisses Counts XIII through XV.

## V.        Civil Conspiracy Claim (Count XVI)

Count XVI is a civil conspiracy claim against all Defendants.  *See* Cplt., at 22 (Dckt. No. 1-1).

"[C]onspiracy, standing alone, is not a separate and distinct tort in Illinois."  *Weber v. Cueto*, 518, 624 N.E.2d 442, 449 (Ill. App. Ct. 1993).  "To state a cause of action for conspiracy, a plaintiff must allege not only that one of the conspirators committed an overt act in furtherance of the conspiracy, but also that such act was tortious or unlawful in character."  *Adcock v. Brakegate, Ltd.*, 645 N.E.2d 888, 894 (Ill. 1994); *see also Lewis v. Lead Indus. Ass'n*, 178 N.E.3d 1046, 1053 (Ill. 2020) (requiring an injury caused by an unlawful overt act for an Illinois civil conspiracy claim).

In light of the dismissal of Love's other tort claims, the Court dismisses the civil conspiracy claim, too.

## VI.        *Quantum Meruit* (Counts XVII–XIX)

Counts XVII through XIX are for *quantum meruit*.  *See* Cplt., at 20–23 (Dckt. No. 1-1).

*Quantum meruit* "is a quasi-contract doctrine that allows the Court to imply the existence of a contract in order to prevent injustice."  *Langone v. Miller*, 631 F. Supp. 2d 1067, 1071 (N.D. Ill. 2009); *Strategic Reimbursement, Inc. v. HCA, Inc.*, 2007 WL 2274709, at *4 (N.D. Ill. 2007) ("*Quantum meruit* is a quasi-contract theory that compensates plaintiffs for acts of unjust enrichment where one party receives services without giving compensation.").

Translated to English, *quantum meruit* means "as much as he deserves." *Kane v. Option Care Enters., Inc.*, 194 N.E.3d 912, 926 (Ill. App. Ct. 2021) (citation omitted). Like unjust enrichment, *quantum meruit* applies "to situations involving implied contracts, invalid contracts, or claims that fall outside contracts." *Plestsov v. GTS Transportation Corp.*, 2020 WL 6059854, at *3 (N.D. Ill. 2020) (citations omitted).

"Recovery in *quantum meruit*, or quasi-contract, is a substitute for recovery on an express contract. Where there is no contract in fact upon which liability may rest, a party may recover in *quantum meruit* where the other party has received a benefit for which justice requires payment. Recovery in quasi-contract requires a *reasonable expectation* that the other party would pay for the services rendered." *Cruz v. Stapleton*, 622 N.E.2d 1253, 1256–57 (Ill. App. Ct. 1993) (emphasis added) (citations omitted).

"To recover under a *quantum meruit* theory, [p]laintiffs must prove that: (1) they performed a service to benefit [defendants], (2) they did not perform this service gratuitously, (3) [defendants] accepted this service, and (4) no contract existed to prescribe payment for the service." *Monco v. Zoltek Corp.*, 397 F. Supp. 3d 1165, 1170 (N.D. Ill. 2019) (citing *Bernstein & Grazian, P.C. v. Grazian & Volpe, P.C.*, 931 N.E.2d 810, 826 (Ill. App. Ct. 2010)).

"Notably, even when a person has received a benefit from another, he is liable for payment only if the circumstances of its receipt or retention are such that, as between the two persons, it is unjust for him to retain it. The mere fact that a person benefits another is not of itself sufficient to require the other to make restitution therefor." *Hayes Mech., Inc. v. First Indus., L.P.*, 812 N.E.2d 419, 426 (Ill. App. Ct. 2004) (cleaned up); *see also RTKL Assocs., Inc. v. Klein*, 2016 WL 7477774, at *3 (Ill. App. Ct. 2016) ("A *quantum meruit* recovery requires a showing that that a defendant has *voluntarily* accepted a benefit which would be inequitable for

him to retain without payment since the law implies a promise to pay reasonable compensation when valuable services are *knowingly* accepted.") (emphasis in original).

Put differently, a plaintiff is not entitled to recover on a *quantum meruit* theory if she had no reasonable expectation of the defendant making a payment. *See Paradise v. Augustana Hosp. & Health Care Ctr.*, 584 N.E.2d 326, 330 (Ill. App. Ct. 1991).

Defendants argue that *quantum meruit* does not apply. As they see things, "no benefit has been retained that would be unjust . . . under Illinois law, [because] Defendants were fully entitled to use Plaintiff's name and likeness in a documentary without her permission or compensation." *See* Defs.' Mem. in Support of Mtn. to Dismiss, at 15 (Dckt. No. 12); *see also* Defs.' Reply, at 9 (Dckt. No. 20) ("There was no unjust retention of any benefit that would support Plaintiff's claims for quantum meruit . . . .").

Here, Love alleges that she received $20 as compensation for appearing in the "Through the Wire" music video. *See* Cplt., at ¶ 14 (Dckt. No. 1). The complaint also states that "Plaintiff Ms. Love did no services for Defendant gratuitously and had a reasonable expectation for compensation if the unseen footage was ever used and if the music video appearance was ever rebroadcast in an alternative form." *Id.* at 23.

By the look of things, part of the claim is about footage that appeared both in the music video *and* in the documentary. And part of the claim is about footage that appeared in the documentary only (that is, the "unseen footage").

The complaint does not allege that Love had a reasonable expectation of compensation for the documentary. There is no suggestion in the complaint that anyone ever contemplated a documentary at the time, let alone brought it up to Love. Put another way, Defendants did not "*knowingly* accept[]" her services for a documentary because no one had dreamed up the

27

possibility of a documentary at the time.  *See RTKL Assocs.*, 2016 WL 7477774, at *3 (emphasis in original).  After all, Kanye West's career was just getting started.

Nothing in the complaint supports the notion that there is anything unjust about using the clips in the documentary without compensating Love.  Love might have had a reasonable expectation of receiving compensation for appearing in the music video, and she received that compensation.  But Love did not have a reasonable expectation of compensation for a documentary 20 years later.  The parties did not contemplate a docuseries, let alone discuss the possibility of using the footage for another production someday.

Love does not allege that she ever discussed the possibility that parts of the recording would be used for a music video, and other parts of the recording would hit the cutting room floor (and saved for later).  Love does not allege that anyone promised her that she would receive additional compensation if they used the cutting-room-floor footage in a later production.

In other words, nothing in the complaint supports the notion that Love should have reasonably expected any compensation if Defendants used the footage from the barbecue restaurant for another audio-visual production.  Love did not plead that she had a reasonable expectation that she would receive pay when her footage appeared in "Jeen-yuhs."  So, the complaint does not suggest that Defendants unjustly retained a benefit.

Therefore, Love's *quantum meruit* claims (Counts XVII, XVIII, and XIX) are dismissed.

## VII.    Unjust Enrichment (Counts XX–XXII)

Finally, Counts XX through XXII are for unjust enrichment.  *See* Cplt., at 23–25 (Dckt. No. 1-1).

Some statements in the case law make it sound like unjust enrichment is a freestanding cause of action.  "To state a cause of action based on a theory of unjust enrichment, a plaintiff

must allege that the defendant has unjustly retained a benefit to the plaintiff's detriment, and that defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience." *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 545 N.E.2d 672, 679 (Ill. 1989); *see also Raintree Homes, Inc. v. Vill. of Long Grove*, 807 N.E.2d 439, 445 (Ill. 2004) ("Here, plaintiffs have no substantive claim grounded in tort, contract, or statute; therefore, the only substantive basis for the claim is restitution to prevent unjust enrichment.").

But in reality, unjust enrichment is not a stand-alone claim at all. It is a theory of recovery when a plaintiff prevails on some other claim.

The Seventh Circuit explained the point in *Cleary v. Philip Morris Inc.*, 656 F.3d 511 (7th Cir. 2011). "Unjust enrichment is a common-law theory of recovery or restitution that arises when the defendant is retaining a benefit to the plaintiff's detriment, and this retention is unjust. What makes the retention of the benefit unjust is often due to some improper conduct by the defendant. And usually this improper conduct will form the basis of another claim against the defendant in tort, contract, or statute." *Id.* at 517.

Unjust enrichment does not stand on its own. Instead, unjust enrichment stands on the shoulders of some other claim. "So, if an unjust enrichment claim rests on the same improper conduct alleged in another claim, then the unjust enrichment claim will be tied to this related claim – and, of course, unjust enrichment will stand or fall with the related claim." *Id.* They rise or fall together.

"Under Illinois law, unjust enrichment is not a separate cause of action. Rather, it's a condition brought about by fraud or other unlawful conduct." *See Vanzant v. Hill's Pet Nutrition, Inc.*, 934 F.3d 730, 739–40 (7th Cir. 2019) (cleaned up); *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*, 631 N.E.2d 436, 447 (7th Cir. 2011); *Ass'n Benefit*

*Servs. v. Caremark Rx, Inc.,* 493 F.3d 841, 855 (7th Cir. 2007) ("[W]here the plaintiff's claim of unjust enrichment is predicated on the same allegations of fraudulent conduct that support an independent claim of fraud, resolution of the fraud claim against the plaintiff is dispositive of the unjust enrichment claim as well."); *see also Flores v. Aon Corp.*, 2023 WL 6333957, at *7 (Ill. Ct. App. 2023) ("Unjust enrichment is not an independent cause of action. 'Rather, it is a condition that may be brought about by unlawful or improper conduct as defined by law, such as fraud, duress or undue influence, and may be redressed by a cause of action based upon that improper conduct.'").

That's reason enough for a dismissal. Love's substantive claims fail, so she can't recover for unjust enrichment, either. The Court dismisses Counts XX, XXI, and XXII.

## Conclusion

For the reasons stated above, Defendants' motion to dismiss is hereby granted.


Date:   February 27, 2024

_____

Steven C. Seeger
United States District Judge